Mr. Hopkins? Yes, good morning, Your Honors. Good morning. I guess the main point that we wanted to emphasize with the Court today has to do with the Curiel investigation. The District Court gave considerable weight to the Curiel investigation, and certainly appellees relied heavily on that in articulating its purportedly non-legitimate, non-discriminatory basis for determination. It's not our position that simply because they've retained an employment defense firm to conduct this investigation that it's inherently biased or that that alone is pretext. But we do argue, however, that where the indication of bias, then that should go to pretext. And we do believe that we do. Which of Ms. Mitchell's claims are you do you think that this point goes to? Well, her race discrimination claim or her retaliation claim, the defamation claim? Well, I'm sorry, sir, the retaliation and discrimination claim. The Curiel investigation supported the basis for Thompson's notice of intent to terminate. Okay. And so what evidence is there in the Curiel investigation that that investigation was either conducted, was instigated by the superior court because of racial animus or the Curiel investigation itself contained racial bias, which the court ratified by, Ms. Thompson in retaliation in June of 03. In July of 03, you have the Falau hearing in which Catalano resides over that and purportedly Falau makes these statements about Mitchell, which prompted Falau to report those to Thompson. Thompson then retained Curiel to conduct an investigation, which she maintains was based on statements that Falau made in the Skelly hearing. But in the deposition, Thompson acknowledges that she can't recall specifically what those statements were. But nonetheless, the Curiel investigation that she prompted followed only just over a month after that DFEH complaint had been filed by Mitchell. So that would go to retaliation. Yes, sir. Okay. Did you have any evidence of discrimination? Well, and I do, sir. And also I wanted to add that there's more wrong with the Curiel investigation than that. But, yes, also what we pointed out was that it's an unprecedented move that the court is retaining this individual to conduct this type of investigation. They didn't remove her It certainly was. It certainly was. But I guess I also have to go back and place the 1999 into context because Ms. Thompson is basing her intent to dismiss. She's stating that it's based on the Curiel investigation and a history of performance issues. But there's no history of performance issues. There's only that previous 1999 investigation, which should have been removed from the file after two years. She was suspended in the recruitment issue, which is the whole thing. But she actually wasn't even suspended. She was given an intent to suspend, which itself was sort of suspended pending the Curiel investigation. Exactly. So it was never a final action. She never took an appeal. It was never processed. And she never served the time. For that 2003 suspension. For the August 2003 suspension. Exactly. Exactly. So there was no, so our basic point is there was no work performance history. There was no record, this ongoing record of disciplinary issues. There was only the Curiel investigation. That's it. And there were other problems with the Curiel investigation, which included the statement. I haven't heard any evidence yet that the Curiel investigation was either begun because of a discriminatory intent on the part of management or was ratified because it somehow incorporated some kind of discriminatory animus against your client. I haven't heard any evidence for that yet. Peggy Thompson was the very person that Mitchell had complained was the object, was the person who was engaged in the discrimination, engaged in the retaliation. Peggy Thompson is the one, no other person engaged Curiel other than Peggy Thompson. If Ms. Thompson did this for racial animus, for reasons of racial animus, then you would have a claim. But I'm asking what evidence do you have that Ms. Thompson was motivated by racial animus? Do you have any evidence whatsoever, any statement that Ms. Thompson made? We don't, we have no direct evidence of racial animus in this case. This is circumstantial evidence that we are trying to prove by an inference that there was a retaliatory intent. But that may, if you're right, if you're right, counsel, that you don't have any evidence, and I haven't seen any. Direct evidence, sir. Direct evidence. Then do you have any circumstantial evidence? Well, that's what I'd like to get into, sir, as well, is that look, the only reason that Thompson prompted this investigation is because this came directly following the defamation complaint that's made against Thompson. Okay, that would be a retaliation claim. Yes, sir. I'm asking specifically about discrimination. Do you have any evidence of discriminatory intent? Any statements, anything in a record, anything that was put into a letter, anything that was said in the ladies' room or that was said in the kitchen? No other evidence than what we're talking about here of the discriminatory intent with respect to the defamation claim. Is it possible that your client got fired because she wasn't a good employee? Well, what evidence in the record is there, apart from the Curiel investigation, that she wasn't a good employee? She's been there for over 20 years. But the Curiel, well, she did have a history of some problems. The Curiel investigation came in. Conducts deposition of numerous employees, and I have to say, having read the Curiel investigation again last night, it was a pretty damning report. Your Honor, she had been a supervisor since 1989. She's accused of lying. She's accused of misuse of violating ethics rules. She's accused of abuse of personnel. How much more do we need in order to be able to dismiss an employee? Well, if I can address those three points, the line he states in his report is that she's been a supervisor from 1989 until 2003, and there's no other reports in her record about any other of her subordinates complaining that she was hostile or mean towards her employees until you get to this Curiel investigation. That's the only information provided. And this is a gentleman who's been retained for 25 years. He's been a supervisor from 1989 until 2003, and there's no other  by Peggy Thompson, the very person who is claiming, who is the person that she's claiming retaliation against. So we do believe that there's some indicia of bias here surrounding this. Well, wasn't there, there was a second independent investigation also by Ms. Shino, correct, that disclosed problems with her management approach? The Shino investigation was Peggy Thompson retained Ms. Shino to investigate what she called a breach of confidentiality that arose out of the Marvin Warren incident. We're all talking about the same incident. This is Peggy Thompson's reaction to Ms. Mitchell's complaints about how the Marvin Warren recruitment process occurred, and that's the whole object of her internal EEO complaint that came in May of 2003, and the whole object of the DFEH complaint that came in June of 2003. All of this is born, Shino and Curiel are both born out of this whole complaint about the Marvin Warren investigation, which she's claiming that this is discriminatory and retaliatory practices. But, yeah, link that up then to Ms. Mitchell's race discrimination claim then. Well, sir, our evidence of retaliation admittedly is stronger, we believe, than the evidence that we have of intentional discrimination apart from how what we're claiming is that during the course of the investigation, how she was treated, the punitive measures that were being taken against her were unprecedented and different than how non-African American employees were being treated in these similar circumstances. So that's where we're coming up with our prima facie case of the intentional discrimination. With respect to the retaliation, looking at all of these circumstances that follow immediately after the DFEH complaint of retaliation and discrimination in the Marvin Warren recruitment process, you have this Curiel investigation where you have all of these concerns with it. And the only thing that happens here is Peggy Thompson takes the Curiel investigation and says, okay, well, I'll accept this on its face, and we'll terminate you for that. And there's no other work history that would do that. Is there anything in the record that would undermine the court from taking, from relying on the Curiel report? In other words, you know, even if he conducted a biased investigation, if they reasonably relied on the report not knowing that, I think that, you know, that cuts in their favor. If I think if I can address this correctly, you have the Curiel makes its finding in its report. This is what the district court bases its finding on. This is what Apelli based their conclusions on. As far as the underlying evidence to support that, he states, for example, that she was responsible for the employees' shopping for food and cooking. Well, the evidence in the record showed that that was an ongoing practice. They had this birthday club, and it was still ongoing even after she was removed. She denied that she had ever sent anybody to Costco. And it was pretty clear she had a number of employees who said, yes, she told us to go to Costco. We were supposed to buy ice cream. We were supposed to buy fake cakes. We were supposed to pick up cookies. And she told Curiel she had never sent anybody. And he asks her again and gives her another opportunity to clarify it, and she's quite adamant that she never sent anybody to Costco. And he said, well, this is just a bald-faced lie. You have two supervisors in the department during that time. That's Tolentino and Mitchell. And you have Lourdes, who people are also complaining about, who also oversees some of the employees. So these employees within this department aren't exclusively supervised and overseen by Mitchell. But they were very clear in their testimony to Mr. Curiel that it was Ms. Mitchell who was sending them. Okay. Your Honor, with respect to that issue, it's an ongoing practice that they had, and it was still ongoing. But why would she tell Curiel that she had never sent anybody to Costco when she had a number of employees that came forward and said, she sent us to Costco? If it's an ongoing practice, why did she simply say it was the birthday club? It's what we always do. This was a good managerial practice. Your Honor, I mean, admittedly, the specifics of that particular exchange between Mitchell and Curiel boil down to what he said versus she said. But we do know that some of the other issues that were raised had nothing to do with Supervisor Mitchell. Supervisor Tolentino oversaw Lourdes, the other individual, and she was the problem that some of the employees were talking about when they were saying that they were having problems with communication with some of the management. Plus, we know that Curiel did not interview all of the staff that were directly under Mitchell. Mitchell provided him with the names of individuals that she directly supervised and recommended that he interview them as well to determine what type of manager or supervisor she was, and he declined to do so. He was also going around telling the employees that he interviewed that he works for Thompson and that Thompson is his client. Is there any reason, though, to believe that Thompson knew that the investigation was inadequate or directed Curiel to conduct an inadequate investigation? Your Honor, we don't have any evidence of what took place in the room between Thompson and Curiel when she retained him. The only thing that we can point to is what happened after that, the circumstances around the investigation, and try to point to those circumstances that we believe challenged the credibility of that investigation. Instead of just taking this investigation on its face, we believe that these issues go to the weight and credibility of the issues which should have been determined by the trial of fact and not resolved at summary judgment. And we believe that the evidence there was sufficient to create a triable issue of fact as to the credibility of those. We did have, we do have recruiting evidence in the record that challenges this investigation, challenges the manner in which it was conducted, and challenges the issue of whether it was an objective or not objective or biased investigation. I'll preserve it if there's no further questions. Thank you, Mr. Hawkins. Thank you, sir. Good morning. May it please the Court. Joseph Wiley appearing representing San Mateo Superior Court. I'd like to start talking about the allegations of retaliation and the evidence that was adduced with respect to the retaliation claim and some evidence that's in the record that Mr. Hopkins omitted with respect to why is there an investigation and why there's no causal link. With respect to the retaliation claim, plaintiff has to show that she made a complaint, that there was an adverse employment action, and that there was a causal link between her complaint and the adverse employment action. In this case, her difficulty stems from she is unable to have any causal link between her complaints that occurred in approximately June of 2003 and the ultimate termination of her employment, which occurred in February 2004. The reason she's not able to do that is there's an intervening factor that occurs, and it's the Dorothy Fa'alu complaints. And what happened was Ms. Fa'alu worked in the department, the criminal division of the court. She received a notice of intent to terminate, which under California law requires the court to hold what's called a Scali hearing, which is a pre-deprivation due process proceeding over which Ms. Rodina Catalano supervised. During that hearing, she brought forth, Ms. Fa'alu brought forth complaints with respect to the supervision in the criminal division. Ms. Catalano relayed those complaints to her boss. This was in late July, approximately six weeks after the DFEH complaint that counsel referenced. This is late July 2003. Ms. Catalano brought those complaints forward to Ms. Mitchell. And both Ms. Catalano and Ms. Mitchell in their deposition affirm that Ms. Catalano brought those complaints to her boss, the court executive officer, Peggy Thompson. And Peggy Thompson testifies, and it's in the record at the supplemental excerpts of record, page 427 and 428, that the reason that she engaged the investigator, Mr. Curiali, to do the investigation, was because of allegations brought by Ms. Fa'alu that employees in the criminal division were being mistreated by their supervisor. Further, she testified at her deposition, it's in the record, at supplemental excerpt of record 434, 435, and 436, that she was aware that there had been prior allegations of misconduct and mistreatment in that department by the supervisors of that department. In one instance, she recalled that an individual had come forward with a complaint and that Tim Sullivan, who is an employee of the county, had tried to investigate that complaint but had not been successful because no employees would come forward to testify to give him any evidence about it. But they, you know, all that shows is that only after she filed her complaint, EEO complaint, that the superior court then suddenly hires not one but two investigators to start poking around in these areas when it had not done so before the complaint was filed. At the time in 1998, the court was part of the county. And so it's the county officer, Mr. Sullivan, who did the investigation because it's part of the county. In 2003, when these events come forward, the court is its own independent employer. It's no longer part of the county pursuant to California SB 2140. It's at Government Code Section 71600 that made the court an independent employer and allows the court, in fact, requires the court to operate independently from the county. And so the court engaged independent investigators. But it's the reason why after she complained, it's the Fa'alu complaint that comes forward. After a plaintiff complained, Fa'alu comes forward with complaints, and they conduct the investigation. With respect to the investigation, there were 20 people that were interviewed during that investigation. Counsel brings forth certain problems, errors, as he calls them, in the investigation. But there were 20 people who were investigated or who were interviewed as part of the investigation. He indicates that there were six people who plaintiff would like to have had interviewed but who were not interviewed. But there is no evidence in the record that if Mr. Criali had interviewed those six people, he would have had any different conclusion. In other words, there's no evidence about what they would have said that were different from the other 20 people who were interviewed. And in his statements about witnesses complaining, the record evidence is replete not just in Mr. Criali's report of the complaints that employees brought forward about ridicule and mistreatment, but at excerpt of record 241 and 242, Ms. Gonzalez, who's a subordinate employee, testifies in her deposition that Ms. Mitchell did make fun of and did ridicule subordinate employees. Ms. Cuellar at excerpt of record 268, 279, 280, and 281 testified that plaintiff was intimidating and that others appeared to be offended by the remarks that she was making. Further, there is no evidence whatsoever when you look at these errors, such as he should have interviewed some more people. I think in the brief counsel references that it's unclear how Mr. Criali got a set of the policies that he was charged with investigating, and that was unclear. There is no evidence in the record that the court was aware of any mistakes, any allegations of mistakes. And moreover, there is no record evidence with respect to the retaliation claim that the errors that he's referencing were the bias of Mr. Criali, that there is any indication that Mr. Criali was biased because of a prior complaint by Ms. Mitchell or because of Ms. Mitchell's race. With respect to Mr. Wiley. Yes. Judge Gould, I have a couple of questions for you. You know, it seems like the Criali report would justify the termination if it's not pretextual, whether there are little mistakes in it or not, or big mistakes that the county or the court could rely on. But could you address the earlier action of sending the notice of intent to suspend her? Which she never was suspended. But just the sending of that notice. Yes, I can. That was sent before the Criali report. So the Criali report doesn't give a reason for that notice being sent. And I think it would help me if you would address whether that notice itself could be considered an adverse action under our precedence. And if so, it's a little closer to the earlier race discrimination complaint and raises the question of whether the timing can show causal nexus. Yes, I could answer those questions, Your Honor. First, let me explain that the notice of intent to suspend that went out in August of 2003 for 10 days was never imposed upon Ms. Mitchell because the events began to overtake it with respect to the Dorothy Fa'alu complaint and the Criali investigation. So although she received a notice of intent to suspend, she never actually was suspended. The court never followed through with respect to that because of the intervening events that occurred. The reason she received that notice of intent to suspend was because of conduct concerning the recruitment process of a man by the name of Warren, who had applied for a position. And that's the Gail Schino investigation that was referenced earlier here today, where Ms. Thompson learned that Ms. Mitchell had been alleged, had engaged in inappropriate actions with respect to an applicant. And she hired Ms. Schino to conduct an investigation. And in the record evidence is the disciplinary action where Ms. Thompson, the proposed disciplinary action, where Ms. Thompson recites what the evidence was that Ms. Schino came up with. And in particular, what we see is that Ms. Mitchell violated court policies in a number of ways, two very principal ways. First, she divulged confidential information to an applicant that is not intended to be disclosed and not supposed to be disclosed to an applicant. In that, she advised the applicant that the court was having difficulty contacting his references and encouraged him to touch base with his references to get more phone numbers for his references. That was in violation of court practice and policy. Second, she, not the court, notified the applicant that he was not a successful candidate, and she did that prior to the conclusion of the candidate process. Third, she sat on the panel, the interview panel, the initial oral interview screen in this process, and she did not divulge that Mr. Warren was the minister at her church and so that she had a special relationship with him. Not that had she disclosed it, it might necessarily have disqualified her, but she failed to disclose that. She further failed to disclose that she was the chairperson of her church's vestry committee that oversees the hiring and firing of the minister, so that she sat in a particularly close relationship with the minister. And she did not disclose that, and she went ahead and sat on the oral panel and only disclosed that much later in the process. And therefore, in Ms. Skeno's report and investigation, she concluded and recommended to Ms. Thompson that discipline was appropriate because of that violation of court policy. So that's why the August 2003 notice of intent to suspend for 10 days goes out. There is a prior suspension, and counsel says there's no disciplinary record, no performance record problem there. That's an inaccurate statement of the record. In 2000, Ms. Mitchell received a suspension, a three-day suspension, for her failure to properly supervise a subordinate employee who showed a search warrant, a search warrant in a criminal matter that was confidential to an attorney who had an interest in the matter. And she was suspended in 2000 for that. Were there other instances where court personnel disclosed confidential information but were not disciplined? Not that we're aware of. She was asked whether there were any comparators that she had in her deposition, and she was not able to give us any comparators that she could compare to with respect to that. That's all I have, unless you have other questions, Your Honor. Okay. Thank you, Mr. Wiley. Thank you. Mr. Hopkins, you have some time remaining. Just a few brief points in response. I just wanted to clarify. You mentioned that there was the 2000 suspension. That's the same reference to the 1999 issue regarding the search warrant. The warrant issue is during this whole ordeal, during the course of the events that were going on with Mr. Warren, she's complaining to the individuals involved and the public that this is a discriminatory process, and that's the communication. And in response to that, she's receiving these responsive actions from Ms. Peggy Thompson. The notice of intent to suspend at that time, counsel states that that was overtaken by the Fowlall investigation, but actually the record shows that there were clearly an insufficient basis for Ms. Thompson to pursue that. And notably, he states to pursue what? To pursue the Fowlall or the? Gail Sheno. The findings from Gail Sheno, from the Gail Sheno investigation. Okay. So there was an insufficient basis for Ms. Thompson to pursue the results of the Sheno investigation? Yes. Yes. Now, I wanted to briefly point out also that. I'm sorry. What tools do we have for judging that it was inappropriate for, that there was an insufficient basis for Ms. Thompson to pursue the Sheno report? Well, this came right, this, the, Ms. Mitchell had complained about the discrimination. She was trying to get them to respond to their, her complaints about the discrimination. And instead, Thompson turns around and retains the investigator to pursue an investigation into Mitchell's conduct surrounding the direct communication that she's having complaining about Warren. All Ms. Thompson does is turns this entire situation around on Ms. Mitchell. And also, the last point that I wanted to add is that these allegations from Fowlall, there are no specific allegations. Even Ms. Thompson in her deposition notes that she doesn't have any specific information about what Fowlall stated. There's no documents on that. But nonetheless, she goes ahead and spends $25,000 on an investigator to conduct an investigation into what she only acknowledges as being some general statement about alleged mistreatment. But there's nothing that counsel has shown in the record as to what specifically it was that Ms. Fowlall had complained about. Just so I'm clear about what you're arguing, you're also making a contention that the Sheno investigation suffered from some of the same flaws of Curiali, that it was a bias or trumped up? Yes, yes, sir. And basically, this is Ms. Thompson's mode of operation in these things. If she gets these responses, gets these complaints against her, and she tries to retain these outside people to substantiate the disciplinary action that she wants to take. Thank you. Thank you, Mr. Hoffman. I'm sorry, sir. Don't you have to go beyond Thompson, though, and present evidence that what the investigator Sheno said or the investigator Curiali said that those were pretexts? Well, what we have done in the record, sir, is we have shown refuting evidence that the underlying findings that were made by, for example, Curiali in his report are discredited. We've presented evidence that challenged those underlying findings. So we're not simply basing our refuting evidence simply on the timing of the investigation. We're also pointing out that, hey, look, the six people not being interviewed, these were the six people that she directly supervised. These were critical people. But we also showed that there were individuals in the investigation who then later came in their deposition and stated that this wasn't Mitchell who we were talking about. We were talking about Lourdes. Mitchell isn't the only person that's supervising these individuals. So we do contend that there is evidence in the record that challenges some of these underlying findings that are being made by both Sheno and Mr. Curiali in their findings, in their investigations. Thank you, counsel. Thank you. All right. We thank both counsel for the argument. Mitchell v. Superior Court is submitted.
judges: Gould, Bybee, Tymkovich